740 So.2d 163 (1999)
Greshlyn JONES
v.
BLUE CROSS/BLUE SHIELD OF LOUISIANA and National Union Fire Insurance Company.
No. 98 CA 0962.
Court of Appeal of Louisiana, First Circuit.
May 14, 1999.
Writ Denied September 24, 1999.
*164 Jennifer Braud Gautreau, Baton Rouge, for Plaintiff-Appellee.
John E. Faherty, Jr., New Orleans, for Defendants-Appellants.
Before: CARTER, C.J., SHORTESS and de la HOUSSAYE,[1] JJ.
SHORTESS, J.
On September 23, 1996, Greshlyn Jones (plaintiff) was walking in the atrium of Blue Cross/Blue Shield of Louisiana (defendant) where she was employed as a claims control clerk. Plaintiff fell backwards while walking, hitting her back and head on the floor. She alleges that she injured her back and experienced neurological problems including severe vision problems, and that due to these injuries, she was unable to return to work. Defendant paid plaintiff workers' compensation benefits through one compensation period from September 30, 1996, to October 20, 1996. Then, defendant terminated benefits it was paying to plaintiff. Defendant also denied plaintiff's request for various medical expenses.
Plaintiff filed a claim for workers' compensation benefits against defendant and its insurer, National Union Fire Insurance Company of Pittsburgh,[2] Pennsylvania (defendants) seeking compensation benefits, medical expenses, and attorney fees. Plaintiff contends defendants were arbitrary and capricious in failing to pay reasonable and necessary medical expenses and workers' compensation benefits. The workers'-compensation court (WCC) found plaintiff was entitled to temporary total *165 disability in the amount of $185.70 per week[3] and past and future medical expenses and benefits, and it awarded $4,000.00 in penalties against defendants.[4] The WCC also assessed against defendants $10,000.00 in attorney fees for their arbitrary and capricious failure to pay indemnity benefits, and $15,000.00 in attorney fees for their arbitrary and capricious refusal to approve reasonably necessary medical treatment.[5] Defendants appeal.
Defendants allege the WCC committed reversible error: 1) in finding plaintiff was entitled to temporary total disability benefits and medical expenses from the date of the accident to present, 2) in awarding penalties and attorney fees, and 3) in denying a continuance of the trial date.

DISABILITY
It is well settled that "[a workers'-compensation judge's] factual findings regarding whether a worker[s'] compensation claimant has met the burden of proving disability is entitled to great weight and will not be overturned, absent manifest error."[6] The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but whether the fact-finder's conclusion was a reasonable one.[7]
We have reviewed the entire record, including the testimony of plaintiff, the deposition of Dr. Ernest G. Thompson (plaintiff's physician), the reports of Dr. Charles E. Eberly (defendants' expert), Dr. Michael Haik (plaintiff's ophthalmologist), and Dr. Allen Proctor (plaintiff's neurologist), and all other medical records, reports, and evidence presented by plaintiff and defendants. We conclude the WCC's finding that plaintiff presented sufficient evidence that her condition of back pain and visual problems were job-related is clearly supported by the record. The WCC's finding that plaintiff was disabled due to her back and visual problems was more than reasonable based upon the record. The WCC's reasons for judgment more fully illustrate the rational basis for these findings. We adopt those reasons as our own, and attach them to this opinion.

MOTION FOR CONTINUANCE
Defendants also allege the trial court committed error in denying their motion to continue. Defendants maintain they did not receive Thompson's medical records, specifically a prescription from him for a TENS unit for plaintiff, until near the date of the trial. Therefore, defendants contend if the medical records had been produced earlier in the case, they would have requested an independent medical examiner sooner and would have been able to question Thompson about a possible disability.
A trial court is vested with wide discretion in granting or denying a continuance, and its ruling will not be disturbed on appeal in absence of clear abuse.[8] *166 While defendants may not have received the information until near the trial date, this information did not deprive them of the knowledge that plaintiff contended she was disabled. Plaintiff did not return to work after the accident because of her injury; in addition, defendants terminated plaintiff for being on disability leave in excess of the time provided by Blue Cross's Employee Handbook. Furthermore, defendants have shown no prejudice arising from their inability to have an independent doctor examine plaintiff. We do not find the WCC abused its discretion in denying the motion to continue the trial.

ATTORNEY FEES
Defendants contend they were reasonable in denying plaintiff's claim, so the award of attorney fees was not justifiable. Louisiana Revised Statute 23:1201.2 allows for the award of attorney fees when an employer or insurer is arbitrary, capricious, or without probable cause in discontinuing payment of a workers' compensation claim.[9] Defendants contend plaintiff's claim was reasonably controverted because there was a conflict between the opinions of defendants' and plaintiff's medical experts. The greatest problem with defendants' contention is that this information was not discovered until after plaintiff's compensation had been terminated. It was stipulated at the hearing that plaintiff was injured during the course and scope of her employment. After the accident, plaintiff received one payment from defendants for workers' compensation benefits for the period from September 30, 1996, to October 20, 1996. However, the report of defendants' expert, Eberly, is dated May 29, 1997, seven months after her payments had been terminated. In addition, plaintiff and her physician, Thompson, were not deposed until September 1997, almost an entire year after the accident. However, defendants were aware plaintiff was alleging she was disabled because her employment was terminated due to her disability leave period being beyond the time allowed by defendant's employee handbook. In addition to workers' compensation benefits, defendants refused to pay for various devices and medical exams plaintiff's doctors prescribed or requested to aid in treating her. As stated by the WCC judge:
As soon as they see that she is having these problems and she is claiming they are work-related because they are being notified that she is claiming that they are due to the work injury, they should have sent her to their neuro asap, quickly. They did not. And, their neuro's evaluation does not unequivocally state that this cannot happen the way she said it did. He said that it probably didn't; it's more likely it didn't. That is not absolutely, positively, did not happen.
They are very arbitrary and capricious in refusing to pay indemnity benefits. They are more arbitrary and capricious in refusing to approve the back treatment, especially the TENS unit and the physical therapy. There was nothing, nada, zip, not a hair, not a scintilla of evidence to show any reason for not approving those very conservative she's not asking for lumbar surgery herevery conservative back treatment.
The trial court awarded $10,000.00 in attorney fees against defendants for their arbitrary and capricious failure to pay indemnity benefits and $15,000.00 for their arbitrary and capricious refusal to approve reasonably necessary medical treatment. We find the WCC did not *167 abuse its discretion in making these awards based upon the above information.
Plaintiff timely filed an answer requesting additional attorney fees. During oral argument plaintiff alleged that defendants have continued to deny plaintiffs medical claims and have not made any payments, which was not contradicted by defendants. Furthermore, for nearly two and one-half years plaintiff has been without compensation and reasonable medical treatment has not been approved. We award additional attorney fees in the amount of $2,000.00 against defendants.

CONCLUSION
Based upon the aforementioned, the judgment of the WCC is affirmed. In addition we amend the award of attorney fees by $2,000.00 for plaintiffs appellate attorney fees. Cost of this appeal are assessed against defendants.
AFFIRMED AS AMENDED.

ATTACHMENT
THE COURT:
THE COURT IS GOING TO TAKE A RECESS. THANKS TO THE PARTIES, THEY HAVE DWINDLED DOWN THE EVIDENTIARY PORTIONS OF THE EVIDENCE THAT'S BEEN SUBMITTED SO THAT THE COURT KNOWS EXACTLY WHAT I NEED TO READ. THERE ARE, OBVIOUSLY, IN TERMS OF OUR LADY OF THE LAKE, BATON ROUGE GENERAL, MAY HAVE PRIOR MEDS THAT ARE NOT NECESSARY AND WHAT HAVE YOU. I WOULD PROBABLY ESTIMATE THIRTY OR FORTY-FIVE MINUTES.
(FOLLOWING A RECESS, THE FOLLOWING PROCEEDINGS WERE HAD)
THE COURT:
WE ARE BACK ON THE RECORD IN THE CASE OF GRESHLYN JONES. THE COURT TOOK A RECESS SO THAT I COULD REVIEW THE EVIDENCE SUBMITTED BY BOTH PARTIES AND I THANK BOTH PARTIES FOR SUBMITTING IT IN SUCH A NICE FORM. IT MADE IT A LOT EASIER FOR ME TO FIND WHAT I NEEDED.
FIRST ISSUE IS WHETHER OR NOT THE EYE CONDITIONS, AND THERE ARE THREE OF THEM WHICH I HAVE FOUND, I WON'T EVEN ATTEMPT TO ENUNCIATE THE FIRST; IT'S HER CROSS-EYED PROBLEM. THE SECOND IS KNOW AS A SIXTH NERVE PALSY, AND THE THIRD IS A RIGHT OPTIC NEURITIS. THE COURT FINDS ALL THREE CONDITIONS TO BE RELATED TO THE ON-THE-JOB INJURY. THE REASONS ARE, ONE, MS. JONES' TESTIMONY WAS UNCONTRADICTED TODAY AS TO THE WAY IN WHICH THE FALL OCCURRED AND THE PARTS OF HER BODY WHICH STRUCK THE FLOOR. ALTHOUGH, AS MR. FAHERTY POINTED OUT, THIS WAS NOTHER HEAD STRIKING THE FLOOR WAS NOT MENTIONED ORIGINALLY TO DR. THOMPSON, THE INITIAL TREATING PHYSICIAN, MS. JONES EXPLAINED THAT SHE WAS NOT HAVING ANY HEAD PAIN AT THAT FIRST VISIT. I CAN UNDERSTAND THERE BEING NO NEED TO DISCUSS SOMETHING THAT YOU DON'T THINK IS INJURED. HOWEVER, VERY SHORTLY, BY MY TIME TABLE WELL WITHIN A WEEK, MORE LIKE THREE OR FOUR DAYS LATER, SHE STARTED COMPLAINING OF HEADACHES AND PROBLEMS WITH HER EYES. WHEN SHE SAW DR. HAIK AND DR. PROCTOR LATER, SHE DID RELATE STRIKING HER HEAD ON *168 THE FLOOR, ALBEIT, NOT ENOUGH TO LOSE CONSCIOUSNESS, NOT ENOUGH IN HER WORDS TO BE DAZED, SHE DID STRIKE HER HEAD.
THE JURISPRUDENCE IN THIS STATE IS CLEAR. IF A PERSON IS ASYMPTOMATIC FOR A CONDITION PRIOR TO AN ACCIDENT AND THEN SYMPTOMATIC AFTER, AND THE PHYSICIANS CANNOT FIND ANY OTHER ETIOLOGY FOR THE CONDITIONS, THEY ARE PRESUMED, IN THE LAW, TO BE RELATED.
THE CASE THAT COMES MOST TO MIND IS THE PEVETO CASE OF WHICH I AM INTIMATELY FAMILIAR. IT IS ONE OF EVEN HARDER FACTS THAN THE PRESENT IN THAT MR. PEVETO HAD PROBLEMS BEFORE AND WORSE PROBLEMS AFTER.
IN TERMS OF THE EYE CONDITION, THERE IS NOTHING ANYWHERE IN THE MEDICALS TO SUGGEST THAT MS. JONES EVER HAD ANY TYPE OF CONDITION OF THIS BEFORE, AND THEN DID HAVE IT AFTER. PLUS, THERE ARE THE MEDICALS. DR. HAIK'S RECORDS DISCUSS THAT SHE STRUCK THE FLOOR. HE HAS NO OTHER EXPLANATION FOR IT. DR. PROCTOR, IN HIS REPORT OF 10/25/96, SAYS THAT HER RIGHT SIXTH NERVE PALSY IS PRESUMABLY TRAUMATIC, ALBEIT UNUSUAL FOR IT TO DEVELOP FROM SUCH A MILD BLOW. HE ALSO, IN DISCUSSING THE MRI ABNORMAL FINDING, STATES THAT IT COULD BE RELATED TO TRAUMA OR AN UNKNOWN DISEASE. THEN THEY WENT ON A SEARCH AND WE'RE TALKING ONE BIG MEGA SEARCH FOR THE UNKNOWN DISEASE.
THIS WOMAN HAS BEEN TESTED FOR EVERYTHING UNDER THE SUNHIV, SARCOMAS, TB, CULTURED FOR EVERYTHING THEY COULD THINK OF. SHE HAS A LUNG BIOPSY, FOR GOSH SAKES. SHE'S HAD TWO LUNG WASHINGS. THEY HAVE DONE DEFENSE WORK FOR HER. THEY HAVE SEARCHED FOR SOME OTHER ETIOLOGY, AND ALTHOUGH THE DOCTORS AREN'T REALLY SATISFIED, THEY CAN'T NAIL IT DOWN. THEY CAN'T FIND AN ETIOLOGY.
IN ABSENCE OF ANY OTHER ETIOLOGY, AND IN LIGHT OF ALL THE EXTREMES TO WHICH ALL THE PHYSICIANS WENT LOOKING FOR ONE, THE FACTS ARE THE FACTS. SHE DIDN'T HAVE IT BEFORE. SHE FELL, SHE STRUCK HER HEAD, SHE'S GOT IT AFTER. IT'S RELATED.
HAD THEY FOUND SOMETHING, MULTIPLE SCLEROSIS, TB, SOME KIND OF SARCOMA THAT COULD BE NAILED FOR THIS, BLUE CROSS/BLUE SHIELD, NATIONAL UNION, WOULD BE OFF THE HOOK. OBVIOUSLY, NOBODY IS GOING TO SAY THAT MULTIPLE SCLEROSIS IS DUE TO A TRAUMA TO THE HEAD OR ANY OF THESE OTHER DISEASES, BUT THEY'RE NOT THERE.
THE ABNORMAL MRI FINDINGS ARE THERE, THE ABNORMAL VISUALLY EVOKED RESPONSES ARE THERE. THEY ARE NOT MAKING THE DIAGNOSES OF RIGHT SIXTH NERVE PALSY AND RIGHT OPTIC NEURITIS BASED UPON SUBJECTIVE COMPLAINTS. THEY ARE BASED UPON POSITIVE OBJECTIVE DIAGNOSTIC TESTING.
NOW, ALTHOUGH THIS WAS NOT SPECIFICALLY MADE AN ISSUE, I ALWAYS CONSIDER IT AN ISSUE *169 WHEN AT ISSUE IS NATURE AND EXTENT OF DISABILITY. NATURE OF DISABILITY. HER DISABILITY IS JOINT IN NATURE. SHE DID SUSTAIN AN INJURY TO HER BACK THAT WAS OBVIOUSLY THE AGGRAVATION OF A PRE-EXISTING CONDITION. SHE HAD PROBLEMS WITH HER BACK BEFORE. SHE HAD A MOTOR VEHICULAR ACCIDENT A YEAR BEFORE AND HAD RECEIVED, ALBEIT JUST A PHONE RENEWAL PRESCRIPTION, TREATMENT FOR THAT BACK INJURY AS LITTLE AS A WEEK BEFORE THIS INJURY, BUT SHE WAS NOT UNDERGOING ACTIVE TREATMENT AT THE TIME. IT WAS SIMPLY THE REFILL OF A PRESCRIPTION AND I AM ABSOLUTELY CERTAIN BASED UPON DR. THOMPSON'S RECORDS AND HIS DEPOSITION, THAT HER CONDITION WAS WORSENED BY THE INJURY THAT SHE SUSTAINED. IT REQUIRED MORE PRESCRIPTIVE MEDICINE; IT REQUIRED PHYSICAL THERAPY; AND, AFTER LESS THAT A MONTH, IT REQUIRED THE PRESCRIPTION FOR A TENS UNIT. A LUMBAR CORSET WAS PRESCRIBED SOMEWHERE IN HERE, BUT WE DON'T KNOW WHEN. THE PRESCRIPTION IS THERE; IT'S UNDATED. IT'S NOT MENTIONED IN HIS NOTES. HE REMEMBERS WRITING IT, IN HIS DEPOSITION, BUT HE CAN'T TELL U.S. WHEN. BUT, SOMEWHERE IN THERE, A CORSET WAS ALSO PRESCRIBED.
SHE WAS NOT UNDERGOING ANY OF THIS TYPE OF TREATMENT PRIOR TO THIS INJURY. MAYBE WAY PRIOR, BUT NOT ANYWHERE IN THE RECENT PAST, NOT EVEN WITHIN THE YEAR.
SO, THE NATURE OF HER DISABILITY IS BACK AND THE EYE CONDITION. IT IS JOINT IN NATURE.
MR. FAHERTY IS CORRECT, DR. THOMPSON'S DEPOSITION IS MORE THAN A LITTLE BIT PITIFUL IN TERMS OF WHAT HER WORK STATUS IS, OR SHOULD HAVE BEEN. HE INDICATES THROUGHOUT HIS DEPOSITION THAT HE CAN'T COMMENT ON IT BECAUSE IT'S NOT WRITTEN DOWN IN HIS NOTES. WELL, GEE, I THINK HE COULD AND I WISH HE WOULD HAVE, AND IF HE HAD BEEN HERE, I WOULD HAVE MADE HIM. BUT, SHE WAS UNDER THE IMPRESSION, DEFINITELY, THAT SHE WAS NOT WORKING. HE WAS GIVING HER SLIPS THAT HE CHARACTERIZED AS WORK EXCUSES, IN AT LEAST ONE POINT IN THE DEPOSITION. AND, HE EXPLAINED THAT THESE ARE TYPICAL THINGS THAT SOMEONE ASKS HIM FOR WHEN THEY ARE NOT GOING BACK TO WORK. IN SEVERAL POINTS, IN GOING THROUGH HIS NOTES, HE KNEW SHE WAS NOT WORKING AND HE NEVER TOLD HER SHE SHOULD BE WORKING.
HE ADMITTED THAT SHE SHOULD NOT DO PROLONGED SITTING, WHICH BY HER EXPLANATION OF HER JOB DUTIES, IS A PRETTY MUCH REQUIREMENT, AS WELL AS BENDING. HE DIDN'T MENTION BENDING, BUT IT DOESN'T TAKE A ROCKET SCIENTIST TO KNOW THAT SOMEONE WITH A LOW BACK PROBLEM SHOULD NOT BE DOING A LOT OF BENDING. IT IS ALSO REQUIRED IN HER JOB.
HER VISUAL PROBLEMS ARE GOING TO PLAY A ROLE IN HER JOB. SHE IS REQUIRED TO SORT, *170 PUT THINGS TOGETHER, TAKE THINGS OFF A COMPUTER. DR. PROCTOR AND DR. EVERLY SAW THAT SHE DID HAVE SOME PROBLEMS WITH HER RIGHT VISION. ALSO, I DO WANT TO MENTION DR. EVERLY.
ALTHOUGH HE STATED IN HIS REPORT IN MAY THAT IT WAS VERY UNUSUAL FOR A MILD TRAUMA TO BE CAUSING THESE PROBLEMS, AND HE FELT IT WAS MOST LIKELY INCIDENTAL AND UNRELATED, HE DIDN'T SAY IT WAS IMPOSSIBLE.
SO, I FEEL THAT THE TREATING PHYSICIAN, DR. PROCTOR, IS GOING TO RULE OUT OVER A ONE-TIME EVALUATION AND REVIEW OF RECORDS BY DR. EVERLY. SINCE DR. EVERLY DIDN'T SAY, "HEY, THIS COULDN'T HAVE HAPPENED THIS WAY," WE'RE BACK TO THE FACTUAL ASYMPTOMATIC OR SYMPTOMATIC AFTER. SORRY I GOT THAT OUT OF CHRONOLOGY. IT'S GETTING LATE.
WITH REGARD TO ABILITY TO WORK, I HAVE ALREADY DISCUSSED THE PROLONGED SITTING, THE BENDING AND THE EYE PROBLEMS THAT WOULD HAVE KEPT HER FROM DOING HER JOB, NOT TO MENTION, AND NOW TO MENTION, THE EXTREMITY OF THE TESTING THAT SHE HAS HAD DONE. IF WE WERE JUST TALKING ABOUT THE BACK ISSUE, I WOULD DEFINITELY HAVE STATED THAT SHE WOULD HAVE BEEN IN AN SEB CATEGORY AND ALL THEY NEEDED TO DO IS VOC REHAB ON HER OR COULD HAVE VOC REHABED HER AT SOME POINT OF TIME IN THERE. BUT, IN LIGHT OF ALL THE TESTING AND EVERYTHING THAT SHE HAD TO DO, THERE'S NO WAY THAT ANYBODY COULD HAVE KEPT A JOB DOWN, ANY TYPE OF JOB, EVEN MINE, THAT DOESN'T REQUIRE YOU TO DO MUCH OF ANYTHING BUT USE YOUR HEAD, AND BE ABLE TO KEEP ANY JOB DOWN AND GO THROUGH ALL THE TESTING THAT SHE'S BEEN THROUGH. AND I'M NOT SURE SHE'S THROUGH YET.
SO, SHE IS TTD TO DATE. NOW, I UNDERSTAND HER PROBLEMS WITH HER EYES HAVE BEEN GETTING BETTER AND SHE MAY VERY WELL GET A RELEASE FROM DR. PROCTOR IN THE FUTURE.
I AM FINDING THAT WITH REGARD TO THE BACK, ALTHOUGH HE DID NOT EXACTLY SAY SO, DR. THOMPSON GAVE MORE THAN ENOUGH IN HIS DEPOSITION TO INDICATE TO THIS COURT THAT WITH REGARD TO HER BACK, SHE'S NOT TTD. SHE'S AT AN SEB LEVEL BECAUSE HE WOULD HAVE ALLOWED HER TO WORK WITH RESTRICTIONS OF NO PROLONGED SITTING AND NO LIFTING OVER TEN POUNDS. WELL, SHE WASN'T LIFTING OVER TEN POUNDS ANYWAY WITH HER JOB. THIS COURT WOULD ADD THE RESTRICTION OF NO REPETITIVE BENDING OR EXCESSIVE BENDING. SO, ON A BACK LEVEL, WE WOULD BE LOOKING AT THOSE THREE RESTRICTIONS.
WITH REGARD TO THE EYES, WE'LL HAVE TO WAIT AND SEE. I UNDERSTAND SHE'S GOT AN APPOINTMENT WITH DR. PROCTOR VERY SOON. DEPENDING ON WHAT HE MIGHT SAYAND I WOULD CERTAINLY SUGGEST THAT IT BE PUT TO HIM, BECAUSE, AS MR. FAHERTY HAS CORRECTLY POINTED OUT, THERE IS NOTHING REALLY IN *171 ANY OF HAIK OR PROCTOR'S NOTES ABOUT AN INABILITY TO WORK. BUT, ONCE AGAIN, IT WOULD HAVE BEEN IMPOSSIBLE FOR HER TO WORK WITH ALL THIS TESTING AND EVERYTHING THEY HAVE BEEN DOING. THERE'S JUST NO WAY. AND, I THINK IF ANYBODY ASKED HIM COULD SHE WORK, THEY WOULD SAY SHE MIGHT HAVE PHYSICALLY BEEN ABLE TO AT TIMES, BUT WITH ALL WE HAVE BEEN PUTTING HER THROUGH, THERE'S NO WAY ANYBODY WOULD HAVE EMPLOYED HER.
SO, I THINK THAT THE NEXT STEP IS, AFTER SHE GOES TO DR. PROCTOR, TO FIND OUT FROM DR. PROCTOR, OKAY, WHAT CAN SHE DO. WE ALREADY KNOW FROM DR. THOMPSON WHAT SHE CAN DO.
YES, DR. THOMPSON ALSO SAID THAT HER BACK CONDITION WOULD BE BETTER IF SHE LOST SOME MORE WEIGHT. I AM CONVINCED SHE HAS BEEN ATTEMPTING TO DO THAT. BUT, HE ALSO STATES SHE COULD BE A LOT BETTER IF SHE HAD THE TENS UNIT, IF SHE HAD THE P.T., AND THE THINGS THAT HAD BEEN DENIED HER.
SO, I AM NOT IMPRESSED WITH THE STRICT DEFENSE THAT HER WEIGHT, IN AND OF ITSELF COULD BE CAUSING HER NOT TO GET BETTER. I THINK THE LACK OF MEDICAL CARE HAS BEEN CAUSING HER TO NOT GET BETTER. HEREIN LIES THE RUB.
SO, WITH REGARD TO INDEMNITY BENEFITS, I'M CONSIDERING HER, BECAUSE OF HER JOINT CONDITIONS, TO BE TTD TO DATE. SO, THAT'S $185.70 A WEEK FROM DATE OF INJURY TO DATE AND UNTIL SUCH TIME AS WORK CAN BE FOUND WITHIN HER RESTRICTIONS THAT WOULD GIVE HER NINETY PERCENT OF HER PRE-INJURY WAGE OR REDUCED BASED UPON JOB AVAILABILITY THROUGH A VOC REHAB COUNSELOR, AND I'VE ALREADY GIVEN YOU SOME INSIGHT ON WHERE TO GO TO LOOK TO DR. PROCTOR FOR THOSE OTHER RESTRICTIONS.
ARBITRARY AND CAPRICIOUS REFUSAL TO PAY BENEFITS ON THE INDEMNITY. THERE IS NOTHING ANYWHERE TO COMBAT THE BACK INJURY. THERE'S NOT ONE PHYSICIAN THAT SAYS THIS IS NOT RELATED, THAT'S SHE'S NOT DISABLED. ALL THEY HAD TO DO AT ANY TIME IS SEND HER TO THEIR DOCTORS. SEND HER TO STEVE WILSON, HE'LL TELL THEM SHE'S NOT DISABLED. THEN WE COULD BE IN IME AND I COULD PICK SOMEBODY TO TELL ME WHAT'S WHAT. WE'VE GOT THOMPSON AND TO ME, THERE'S MORE THAN ENOUGH EVIDENCE IN HERE BETWEEN HER TESTIMONY, THOMPSON'S NOT SO GREAT TESTIMONY, BUT THE SLIPS, AND THE FACT THAT SHE IS DISABLED.
AND, I COUNTED NO LESS THAN SIX EPISODES OF DISCUSSIONS WITH WHOEVER PEGGY IS, THEN, JUST WORKERS' COMP, WORKERS' COMP, WORKERS' COMP, ABOUT DISABILITY, TENS UNITS, THE FACT THAT THIS IS A WORKERS' COMP CASE, P.T., THEY KNEW THAT HE HAD DISABLED HER. HE DIDN'T KNOW HE HAD DISABLED HER, BUT I'M CONVINCED THEY KNEW AS A RESULT OF ALL OF THESE CONVERSATIONS.
PLUS, THE TERMINATION NOTICE SPECIFICALLY SAYS SHE IS BEING LET GO BECAUSE SHE HAS EXPIRED HER LEAVE DUE TO *172 HER DISABILITY. NOT HER WORDS, THEIR WORDS. THE WORDS OF THE EMPLOYER.
THEN, WE HAVE THE EYE CONDITIONS. I CAN EASILY SEE THE REASON WHEY THEY MIGHT BALK INITIALLY AT THESE EYE PROBLEMS, BUT ALL THEY HAD TO DO, SAME AGAIN, SEND HER TO YOUR DOCTOR. THEY DIDN'T SEND HER TO THEIR CHOICE OF DOCTOR FOR ALMOST A YEAR. THIS HAPPENED IN SEPTEMBER. SHE DIDN'T GO TO THEIR CHOICE OF DOCTOR UNTIL THE END OF MAY, EIGHT MONTHS. GEE, SHE WAS IN PROCTOR'S OFFICE INSIDE OF A MONTH OF THE INJURY.
AS SOON AS THEY SEE THAT SHE IS HAVING THESE PROBLEMS AND SHE IS CLAIMING THEY ARE WORK-RELATED BECAUSE THEY ARE BEING NOTIFIED THAT SHE IS CLAIMING THAT THEY ARE DUE TO THE WORK INJURY, THEY SHOULD HAVE SENT HER TO THEIR NEURO ASAP, QUICKLY. THEY DID NOT. AND, THEIR NEURO'S EVALUATION DOES NOT UNEQUIVOCALLY STATE THAT THIS CANNOT HAPPEN THE WAY SHE SAID IT DID. HE SAID THAT IT PROBABLY DIDN'T; IT'S MORE LIKELY IT DIDN'T. THAT IS NOT ABSOLUTELY, POSITIVELY, DID NOT HAPPEN.
THEY ARE VERY ARBITRARY AND CAPRICIOUS IN REFUSING TO PAY INDEMNITY BENEFITS. THEY ARE MORE ARBITRARY AND CAPRICIOUS IN REFUSING TO APPROVE THE BACK TREATMENT, ESPECIALLY THE TENS UNIT AND THE PHYSICAL THERAPY. THERE WAS NOTHING, NADA, ZIP, NOT A HAIR, NOT A SCINTILLA OF EVIDENCE TO SHOW ANY REASON FOR NOT APPROVING THOSE VERY CONSERVATIVE SHE'S NOT ASKING FOR LUMBAR SURGERY HEREVERY CONSERVATIVE BACK TREATMENT.
I AM CONVINCED THAT THE LACK OF THIS CONSERVATIVE BACK TREATMENT HAS LED TO THE PROLONGING OF HER CONDITION.
THE ACT IS CLEAR. THERE IS A $2,000 CAP. PENALTY FOR NOT PAYING INDEMNITY BENEFITS IS $2,000. PENALTY FOR NOT APPROVING MEDICAL TREATMENT IS $2,000. I DO NOT HAVE IN FRONT OF ME EVIDENCE OF BILLS ACTUALLY BEING SUBMITTED THAT I CAN SEE, SO I'M LEAVING THAT CAP AT $2,000 ON THE PENALTY. HOWEVER, I AM ASSESSING A $10,000 ATTORNEYS' FEE FOR NOT PAYING THE INDEMNITY BENEFITS AND I'M ASSESSING A $15,000 ATTORNEYS' FEE FOR NOT TAKING CARE OF THE APPROVAL OF MEDICAL TREATMENT THAT HAS LED TO NOT ONLY A PROLONGING OF WHAT IS RELATIVELY A MINOR BACK CONDITION, BUT ALL THE TESTING, EVERYTHING THIS WOMAN HAS BEEN THROUGH FOR THESE EYE CONDITIONS, AND FOR THERE TO BE NOTHING OUT THERE TO CONTRADICT IT FOR EIGHT MONTHS. THEN, FINALLY, IN EIGHT MONTHS, ALL WE'VE GOT IS, IT'S MORE LIKELY THAT IT DIDN'T HAPPEN, BUT NOT THAT IT COULDN'T BE RELATED, IS PREPOSTEROUS TO ME THAT THIS HAS NOT BEEN PAID.
BLUE CROSS/BLUE SHIELD IS HER HEALTH INSURANCE PROVIDER. SHE TESTIFIED THAT SHE SUPPLIED THESE UNDER CARE SLIPS, PRESCRIPTION SLIPS, DIRECTLY TO THE EMPLOYER IN THE FIRST MONTH *173 THAT SHE WAS THERE. SO, THEY KNEW, AS WELL AS NATIONAL UNION. AND, I HAVE TO INFER THAT NATIONAL UNION KNEW. I DON'T HAVE ANYTHING TO MITIGATE THE EXPOSURE BETWEEN NATIONAL AND BLUE CROSS/ BLUE SHIELD. I HAVE NO COMPUNCTION, VERY OFTEN, IN FINDING AN EMPLOYER MORE RESPONSIBLE THAT AN INSURER, DEPENDING ON THE COMMUNICATION BETWEEN THE TWO. BUT, I DON'T HAVE THE ADJUSTER HERE TO TELL ME THAT THE EMPLOYER DIDN'T SUPPLY THEM WITH INFORMATION. I HAVE DR. THOMPSON TALKING TO THE ADJUSTERS. I HAVE THE EMPLOYER KNOWING WHAT'S GOING ON, BECAUSE I'M SEEING REPORTS FROM PROCTOR, C.C. TO SHERRY HUNT AT BLUE CROSS/BLUE SHIELD. I'VE GOT TESTIMONY OF THE CLAIMANT THAT SHERRY HUNT, WHO IS AN ATTORNEY FOR BLUE CROSS/BLUE SHIELD, WAS GIVEN THE SLIPS THAT SHE GOT FROM DR. THOMPSON.
SO, BLUE CROSS/BLUE SHIELD AND NATIONAL UNION SHARE EQUALLY IN MY ASSESSMENT OF THE PENALTIES AND ATTORNEYS' FEES, FIFTY-FIFTY, BECAUSE I CAN'T TELL WHERE ONE KNEW WHAT AND THE OTHER LEFT OFF.
INTEREST IS DUE ON EACH INSTALLMENT AS IT BECAME DUE. INTEREST IS SET AS OF WHATEVER THE RATE WAS FOR 1996. UNDER THE RECENT JURISPRUDENCE, IT IS SET BY THE DATE OF JUDICIAL DEMAND.
NOTES
[1] Judge Edward A. de la Houssaye, III, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] In her disputed claim form, plaintiff initially named AIG Claim Service, Inc., as the insurance company. However, National Union answered and has appeared throughout the record.
[3] The WCC awarded this amount for indemnity benefits for the period beginning with the date of injury, September 23, 1996, to present and "until such time that [plaintiff] is found not disabled by this Court with a credit to defendants for payments made to present."
[4] Plaintiff was awarded $2,000.00 in penalties against defendants because they were arbitrary and capricious in failing to pay indemnity benefits, and another $2,000.00 in penalties for their arbitrary and capricious refusal to approve reasonably necessary medical treatment.
[5] The WCC also awarded interest "to [plaintiff] at the rate of judicial interest each year on each installment of the temporary total disability benefits as it became due[,] back to the date of judicial demand."
[6] Alford v. Environmental Monitoring, 93-0985, p. 2 (La.App. 1st Cir.10/7/94), 646 So.2d 961, 963.
[7] Id. at p. 3.
[8] Our Lady of the Lake Hospital v. Vanner, 95-0754, p. 5 (La.App. 1st Cir.3/27/), 692 So.2d 40, 42; writ denied, 97-1567 (La.9/26/97), 701 So.2d 992, cert. denied, ___ U.S. ___, 119 S.Ct. 57, 142 L.Ed.2d 45.
[9] Revised Statute 23:1201.2 provides:

Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of all reasonable attorney fees for the prosecution and collection of such claims. The provisions of R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions of R.S. 22:658(C) shall be applicable to claims arising under this Chapter.